UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS NELSON KEYS,<br><br>Defendant. | No. 2:16-CR-00234-KJM<br><br>ORDER |

Defendant moves for compassionate release from incarceration under 18 U.S.C. § 3582(c). He argues the coronavirus ("COVID-19") poses an extraordinary risk to his health as a someone who was previously infected with the coronavirus, suffers from asthma, hepatitis B, possible hypertension, high cholesterol and extreme obesity. Mot., ECF No. 56. The government opposes, Opp'n, ECF No. 58, and defendant has replied, Reply, ECF No. 62. For the following reasons, the court GRANTS defendant's motion for compassionate release and GRANTS defendant's requests to seal his medical records and the government's request to seal defendant's medical records, ECF Nos. 57 & 59.

I.   BACKGROUND

On November 6, 2017, defendant, by way of written plea agreement, pled guilty to Count 3 of the Indictment, distribution of a mixture and substance containing a detectable amount of heroin in violation of 21 U.S.C. § 841(a)(1). Plea Agreement, ECF No. 31. On April 6, 2018,

the previously assigned judge sentenced defendant to 84 months' imprisonment with 36 months' supervised release. Hr'g Minutes, ECF No. 47. Defendant is currently incarcerated at FCI Terminal Island. Opp'n, Ex. 1 ("BOP Public Inmate Data."). As of this writing, defendant has served 47 months of his 84-month sentence. *Id.* The BOP has calculated defendant's projected release date as November 18, 2022, through application of good time credit, and defendant is eligible for home detention beginning May 18, 2022. *Id.* at 2–3.

      A.      Defendant's Medical Conditions

On August 24, 2020, defendant filed the instant motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), arguing his history of asthma, hepatitis B and obesity makes him particularly susceptible to developing serious complications from a COVID reinfection and, paired with the coronavirus outbreak at the facility where he is housed, "extraordinary and compelling reasons" warrant compassionate release. Mot. at 1; Mot., Ex. A ("Medical Records");[1] Not. of Req. to Seal, ECF No. 57; *see also* Opp'n Ex. 2; Not. of Req. to Seal, ECF No. 59.[2]

Defendant's medical records document his medical conditions as: hepatitis B, high cholesterol, asthma, possible hypertension and body mass index (BMI) of 44.1. Medical Records at 2, 4, 5, 6 (sealed). Medical records also indicate defendant was tested for COVID-19 on April 17, 2020, *id.* at 9–11 (records from defendant's visit on April 17, 2020), received a positive result on April 29, 2020, Opp'n Ex. 2 at 31, and as of June 19, 2020 he had recovered in that he at that point "denie[d] any symptoms" and his chest x-ray showed "no radiographic evidence for an

---

[1] Defendant submitted this record *in camera* and requested the court seal it due to the sensitivity of defendant's medical records. ECF No. 57. The court GRANTS defendant's request to seal Exhibit A and directs the Clerk to file this document under seal concurrently with this order. The medical records document defendant's medical encounters at BOP Health Services from May 16, 2019 to June 26, 2020. *See generally* Medical Records (sealed).

[2] The government also submitted a copy of defendant's medical records *in camera* and requested the court seal them due to the sensitivity of defendant's medical information. ECF No. 59. The court GRANTS the government's request to seal Exhibit 2 and directs the Clerk to file this document under seal concurrently with this order. The medical records document defendant's medical encounters at BOP Health Services up to July 31, 2020.

2

acute cardiopulmonary process," Medical Records at 6 (describing defendant's June 19, 2020 clinic encounter).

### B. Conditions at FCI Terminal Island

As of the government's filing of its opposition, FCI Terminal Island had reported 3 staff tested positive, 10 inmate deaths, 594 inmates designated as recovered and 23 staff members designated as recovered at that institution. Opp'n at 6 (citing BOP, *COVID-19 Cases* (updated daily)).[3] At the time of this writing, the facility reports similar figures: 6 currently infected inmates and 3 staff infected, with 10 inmate deaths, 574 inmates recovered and 23 staff recovered.[4]

### C. Administrative Remedies and Exhaustion

On April 25, 2020, defendant submitted a request for compassionate release/reduction in sentence to the warden at FCI Terminal Island, Opp'n at 11, which the warden denied on May 29, 2020, Mot. Ex. F (BOP Denial Letter). As a result, the government does not dispute defendant has exhausted his administrative remedies and satisfied the statutory requirement of exhaustion set forth in 18 U.S.C. § 3582(c)(1). Opp'n at 11. The court thus finds defendant has exhausted his request within the Bureau of Prisons and hereby SUBMITS defendant's motion for resolution here.

## II. LEGAL STANDARD

Defendant brings his motion for release under 18 U.S.C. § 3582(c)(1)(A)(i), which allows a court to modify a sentence under certain circumstances. Under the current version of the statute, a motion for modification may be made by either the Director of the Bureau of Prisons or by a defendant "after the defendant has fully exhausted all administrative rights to appeal[.]" 18 U.S.C. § 3582(c)(1)(A).

---

[3] As have other courts, this court takes judicial notice of the information presented by the BOP at https://www.bop.gov/coronavirus/ (last accessed October 5, 2020). *See United States v. Daniels*, No. 19-CR-00709-LHK (NC), 2020 WL 1815342, at *3 (N.D. Cal. Apr. 9, 2020).

[4] *Id.* (accessed November 3, 2020).

In order to modify a sentence and grant compassionate release following exhaustion, as relevant here, a district court engages in a two-step process. First, it must consider the familiar 18 U.S.C. § 3553(a) factors applicable at the original sentencing, to the extent they remain applicable at the time a motion is brought. 18 U.S.C. § 3582(c)(1)(A). Second, the court must find that "extraordinary and compelling reasons warrant such a reduction." *Id.* 18 U.S.C. § 3582(c)(1)(A)(i). An alternative provision provides for consideration of a motion by a defendant who is 70 years or older, and so is not applicable here. 18 U.S.C. § 3582(c)(1)(A)(ii).

The Sentencing Commission has addressed what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody in a policy statement. *See* U.S.S.G. § 1B1.13. Since passage of the First Step Act, many courts have held that the policy-statement provision, previously applicable to § 3582, "no longer fits with the statute," *United States v. Cantu,* No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019), and therefore "federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction," *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). At the same time, a court can give the policy statement some weight in determining a request for compassionate release. *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In resolving the instant motion, this court, as it has in other similar cases, considers the Sentencing Commission's policy statement as guidance, without determining whether it is binding in this context. *See United States v. Head*, No. 2:08-CR-00093-KJM-2, 2020 WL 3180149, at *1 (E.D. Cal. June 15, 2020) (collecting cases finding U.S.S.G. § 1B1.13 no longer limiting but considering the policy statement as guidance).

III.   DISCUSSION

  A.   "Extraordinary and Compelling Reasons"

Defendant argues his health issues make him particularly susceptible to developing serious complications from a COVID-19 reinfection. Mot. at 16–19. He notes that at FCI Terminal Island, where defendant is housed, a 54-year-old inmate named Adam Solarzano died of

COVID-19 on May 24, 2020, a month after BOP physicians deemed him recovered and about a week after he had received negative results from two coronavirus tests.  Mot. at 19 (citing BOP, *Inmate Death at the FCI Terminal Island*[5]).  Another inmate, Michael McDonald, also died after a two month battle with the disease.  Reply at 13.  Defendant argues the similarities between his case and that of Mr. Solarzano's, the conditions at FCI Terminal, and his medical history as described above constitute "extraordinary and compelling reasons" warranting compassionate release.  *Id*.  He says the fact he once before survived a COVID-19 infection suggests he is likely to be reinfected if he continues to be housed at FCI Terminal Island, without the ability to socially distance or self-care.  Mot. at 25.  The government counters: (1) defendant's "asymptomatic case of the coronavirus and recovery is an extremely positive sign for him . . . [because he] has endured the illness seemingly without substantial adverse health outcomes," Opp'n at 19; and (2) defendant has not met his burden in light of the § 3553(a) factors to show he is not a danger to the community, *id.*  The court addresses these arguments below.

          1.       <u>Defendant's Risk of Reinfection</u>

As noted, defendant's records show he was diagnosed positive for COVID-19 on April 29, 2020.  Medical Records at 9–11; Opp'n Ex. A at 31.  Courts are divided on the question of whether compassionate release is warranted after a defendant has ostensibly recovered from a COVID-19 infection.  Some courts have found, in light of the scientific uncertainty surrounding society's present understanding of COVID-19, a previous infection cuts against compassionate release.  *See, e.g., United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *2 (W.D. Wash. June 29, 2020) ("releasing uninfected inmates mitigates the concrete risk of them getting infected, releasing [defendant] would reduce the risk of him getting reinfected.  That risk is . . . speculative.").  Other courts have opted to "err on the side of caution to avoid potentially lethal consequences for [defendant]" because "simply announcing that an inmate has 'recovered' does not mean [defendant] is completely safe from the virus."  *United States v. Armstrong*, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *3 (S.D. Cal. July 30, 2020) (internal quotations,

---

[5] *See* https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf) (accessed on Nov. 3, 2020).

1  citation omitted) (finding "particularly persuasive that an inmate, being housed at the same
2  facility as [defendant], was hospitalized and died after he was pronounced 'recovered' by the
3  BOP"). While a CDC representative recently has suggested that "based on current evidence
4  . . . reinfections are likely uncommon within 3 months," this observation is not conclusive so as to
5  provide clarity regarding whether someone who has been infected is immune for any period of
6  time, no matter how brief.[6]

7  Here, the court takes account of the high level of infection at FCI Terminal Island,
8  the lack of scientific certainty regarding whether reinfection is possible after a purported recovery
9  or negative test, or whether any COVID-19 immunity lasts for a meaningful period time, coupled
10 with defendant's prior infection and his multiple health conditions, the court finds defendant's
11 specific risk of reinfection appears to be heightened at FCI Terminal Island. *See United States v.*
12 *Yellin*, No. 3:15-CR-3181-BTM-1, 2020 WL 3488738, at *2 (S.D. Cal. June 26, 2020) (granting
13 compassionate release of inmate with underlying medical conditions who was infected with
14 COVID-19, but did not develop severe symptoms, in part because inmates were not tested for
15 COVID-19 unless they displayed symptoms and given the risk reinfection could have on inmate's
16 health). The particular data on cases at FCI Terminal Island support this conclusion. Despite his
17 having had COVID-19, defendant is not foreclosed from showing "extraordinary and compelling
18 reasons" supporting his release.

19           2.      Implications of Defendant's Medical History

20 Defendant's medical records confirm defendant suffers from and receives
21 treatment for asthma, hypertension, hepatitis B, high cholesterol and obesity, Mot. at 16–17
22 (relying on Medical Records at 1, 3, 5 (under seal)). Factually, the government does not
23 challenge defendant's suffering from any of the health conditions he identifies. Opp'n at 15–17.
24 The government does, however, dispute defendant's asthma is a risk factor that "might" lead to
25 "an increased risk" of COVID-19 complications. *Id.* at 15–16 (citing CDC, *People Who are at*

---

[6] https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2020-10/COVID-Wallace.pdf (accessed November 3, 2020).

6

*Increased Risk for Severe Illness*[7] (noting "moderate to severe" asthma is only category of asthma recognized by CDC as risk factor for COVID-19)); *see also* CDC, *People with Certain Medical Conditions*[8]). Similarly, the government notes defendant's "general hypertension" as opposed to "pulmonary hypertension [….] may increase your risk of severe illness from COVID-19." *Id.* The government accurately picks up on a distinction the CDC makes, that those with pulmonary hypertension "are at an increased risk," while those with general hypertension only "might be at an increased risk"[9] Nevertheless, the government ultimately appears to concede defendant's obesity is a chronic health condition that "technically involves an increased risk of severe illness from COVID-19, as set forth by the Centers for Disease Control." Opp'n at 16–17.

Responding to the government's argument that defendant's "recovery from a mild case of COVID-19 underscores . . . his combination of health concerns and age of 33" would not lead to serious complications if he is reinfected, Opp'n at 19, defendant points to CDC data recognizing the risk of death from COVID-19 is "4 times higher for people in 30-39 age range than people in the 18-29 age range." Reply at 10 (citing CDC, *COVID-19 Hospitalization and Death by Age*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last accessed: October 5, 2020)). While the court does not adopt a categorical rule as defendant suggests regarding age, it does find defendant's combination of serious health conditions in light of his age in the 30 to 39 year range weighs in favor of a sentence reduction. *See also United States v. Laborin*, No. 2:15-cr-00002,

---

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last updated September 11, 2020) (last accessed October 2, 2020).

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated September 11, 2020) (last accessed October 2, 2020).

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (accessed on November 3, 2020).

7

2020 WL 5909493, at *4 (E.D. Cal. Oct. 5, 2020) (obesity and asthma in 40-year old inmate were extraordinary and compelling reasons for release).

### 3.     Defendant's Current Placement

Defendant argues the particular conditions at FCI Terminal Island heighten the potential lethality of defendant's exposure to COVID-19. Mot. at 20. He says living conditions at FCI Terminal Island are particularly dire because, at the time he filed the pending motion, there was a high number of recovered inmates, along with three inmates currently infected and undoubtedly more infected prisoners who have not been tested. *Id.* at 24. Defendant also points to the death of Mr. Solarzano, *id.* at 20–21, and Mr. McDonald as well, both inmates at FCI Terminal Island who died after testing positive and subsequently deemed "recovered," Reply at 13 (citing BOP, *Inmate Death at Terminal Island*[10]).

The court evaluates defendant's placement in light of the CDC's recommendations for individuals with hepatitis B, obesity, asthma, high cholesterol and hypertension to protect themselves from COVID-19, by, *inter alia*: "keep[ing] space between yourself and others," "stay[ing] home," and "[c]lean[ing] your hands often by washing with soap and water or using an alcohol-based sanitizer." CDC, *How to Protect Yourself & Others* (last updated April 24, 2020).[11] The recommendations emphasize "[k]eeping distance from others is especially important for people who are at higher risk of getting very sick." *Id.*

Despite the BOP's efforts to control the spread of COVID-19, the record before the court allows a strong inference defendant cannot comply with the CDC's recommendations while incarcerated at FCI Terminal Island. In reaching this conclusion, the court relies on the numbers of infections and deaths the institution has experienced, namely the at least 574 inmate infections and 10 inmate deaths, with an infection rate well over 50 percent.[12] Nothing in the

---

[10] *See* https://www.bop.gov/resources/news/pdfs/20200622_press_release_trm.pdf (June 22, 2020) (last accessed: October 7, 2020).

[11] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html (last updated September 11, 2020) (accessed October 2, 2020).

[12] 70.4% of the inmate population at the facility has contracted COVID-19, compared to 2% of the total United States population (https://coronavirus.jhu.edu/map.html) (accessed on

record indicates BOP is instituting stronger, more effective public health measures in an effort to limit or prevent inmates' exposure to COVID-19. Given the government does not disagree defendant's obesity increases his risk of severe illness if reinfected, and his hepatitis B and hypertension may add to that risk, these undisputed health factors alone make him vulnerable to serious illness or death if he remains at FCI Terminal Island. This is especially so because he is likely unable to engage in the self-care the CDC recommends for someone with his conditions. The court finds this suffices to show an "extraordinary and compelling reason" to grant defendant compassionate release.

B. § 3553(a) Factors and Dangerousness

As noted, the advisory Guidelines counsel "the court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release, and the [c]ourt should not grant a sentence reduction if the defendant poses a risk of danger to the community, as defined in the Bail Reform Act." *Esparza*, 2020 WL 1536155, at *3 (citing U.S.S.G. § 1B1.13); *see also* 18 U.S.C. § 3582(c)(1)(A).

Defendant argues his "serious underlying health conditions" and potential danger of being reinfected and becoming severely ill, along with the other § 3553(a) sentencing factors "clearly warrant relief." Mot. at 19. In its opposition, the government argues defendant's "prior criminal history" and his "significant threat to the public" show a sentence reduction "is inconsistent with a careful weighing of the § 3553(a) factors and [] is not warranted." Opp'n at 21–23. The government highlights defendant's "number of serious convictions" including a March 2009 prior for possession of a loaded firearm not registered to him and possession of ammunition, a March 2011 conviction for conspiracy to commit student loan fraud and a February 2014 conviction for driving under the influence of drugs. *Id.* at 20; *see also* Presentence Investigation Report (PSR) ¶¶ 42–50. Additionally, the government argues defendant has shown "an ability to play both sides of the law" with his history of committing crimes even while working for law enforcement as an informant. Opp'n at 20–21 (citing Compl. ¶¶ 13–18

---

Nov. 3, 2020) (9.371 million infections in the United States, which has a total population of 328.2 million people).

9

(describing defendant's "unauthorized criminal activity" including purchasing firearm and heroin while also serving as informant for Sacramento Police Department)).

In reply, defendant argues the government wrongly characterizes his "positive or cooperative conduct as supporting further incarceration," when instead "[i]t is clear that [defendant's] criminal conduct is related to drug addiction." Reply at 20. His record, with "virtually no violent conduct," does not "indicate he poses a real risk of committing a violent offense." *Id.* (citing PSR ¶ 34). Defendant acknowledges the risk "he might relapse into drug use, develop a habit, and again sell drugs or guns to support his habit." *Id.* at 20. He posits an additional 26 months' incarceration would not decrease this risk of reoffending, pointing to three U. S. Sentencing Commission studies showing no difference in recidivism rates between drug trafficking offenders who received a sentence reduction and those who did not. *Id.* (citing USSC.gov, *Retroactivity and Recidivism*[13]).

Defendant's crime is indisputably a serious one. At the same time, it was nonviolent. Defendant has served forty-seven months, approximately 55 percent of his sentence; if good time credits are applied, he is eligible for home detention beginning November 18, 2022. Public Inmate Data at 3–4. The government does not dispute defendant's representation that he has an exemplary prison record, with no disciplinary incidents; instead the government argues defendant's "purported rehabilitation alone does not satisfy his burden." Opp'n at 21–22 (citing USSG § 1B1.13, comment (n.3) ("[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.")).

It is true, defendant's record in prison is not the only factor to assess, but as defendant notes in reply, prison rehabilitation is a "'critical factor' in judging the reasonableness of a sentence under § 3553 (a)." Reply at 19 (quoting *Pepper v. United States*, 562 U.S. 476, 491 (2011)). During his four years within BOP, defendant has in fact earned good time credits and avoided disciplinary incidents. Public Inmate Data at 10–16; *see United States v. Parker*, No. 2:98-CR-00749-CAS-1, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020) (finding

---

[13] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-retroactivity-recidivism.pdf (last accessed: September 16, 2020).

evidence of defendant's rehabilitation weighed in favor of granting motion for compassionate release; collecting cases). He has completed a significant amount of programming, including drug courses aimed at increasing awareness of the negative impact of drug use, and preventing relapse after release. *See* Mot. Ex. J.

In reviewing all the factors to be considered in imposing a sentence, 18 U.S.C. § 3553(a), the court here finds "reducing [defendant's] sentence would not be an abrupt departure from [defendant's] current sentence." *United States v. Applewhite,* No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (alteration in original; internal quotations omitted). No factor or combination of factors precludes the requested remedy here, given defendant's evidence of rehabilitation. The court has conferred with its Probation Office, which will assign an officer to supervise defendant in this district. Mr. Keys' release plan is to live with his father, Mr. Keys Sr., as well as his mother, sister and his sister's two minor children in their home in Sacramento. That office has confirmed defendant's proposed release plan is appropriate. *See generally* Declaration of Thomas Keys Sr. ("Keys Sr. Decl."), Def.'s Ex. L, ECF No. 56-1, at 57–58 (declaration of defendant's father detailing plans for defendant to live with him upon release). Mr. Keys Sr. has advised Probation that he has removed his firearms from the family home and is willing to declare the home will contain no firearms for as long as defendant resides there on supervised release. Mr. Keys Sr. also has represented he understands and is willing to support defendant's compliance with all release conditions.

In light of the foregoing, the court finds defendant does not present an unsupervisable risk of danger to the community as contemplated by 18 U.S.C. § 3142(g). Accordingly, the court exercises its discretion to reduce defendant's sentence as described below, because extraordinary and compelling reasons support the reduction. While the government has requested an opportunity to brief appropriate conditions, including a release plan and a period of home confinement, the court imposes those conditions with no need for further briefing. To the extent the government requests a period of quarantine be imposed prior to defendant's release from BOP, Opp'n at 15 (citing 18 U.S.C. § 3582(c)(1)(A)), this request is DENIED. *See United States v. Scparta*, No. 18-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020).

IV.     CONCLUSION

For the foregoing reasons, defendant's motion for compassionate release is GRANTED as follows:

The court modifies defendant's previously imposed sentence of incarceration of 84 months to time served, with the added special condition of supervised release for six months during which defendant will be subject to home confinement with defendant's bearing the attendant cost of location monitoring. During the period of home confinement, defendant's movement in the community shall be restricted as follows, with all activities subject to pre-approval by the probation officer: defendant shall be restricted to his residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities as pre-approved by the probation officer.

There being a verified residence and an appropriate release plan in place, this order is stayed for up to seven days to make appropriate travel arrangements and to ensure defendant's safe release.  Defendant shall be released as soon as appropriate travel arrangements are made, and it is safe for the defendant to travel.  If more than seven days are needed to make appropriate travel arrangements and ensure defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

The court ORDERS Mr. Keys to self-isolate for fourteen days in his father's home once he arrives there, as a means of protecting his health and that of the others residing in the home while also complying with all applicable public health orders.

The court GRANTS the parties' requests to seal defendant's medical records.

This order resolves ECF Nos. 56, 57, 59.

IT IS SO ORDERED.

DATED:  November 12, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE

12